IN THE UNITED STATES DISTRICT COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CASE NO. 15-1039

Peter B., Jimmy "Chip" E.,
                    Plaintiff,

     vs.

Beverly Buscemi, Christian Soura,
William Danielson, the South Carolina Department
of Health and Human Services and the South Carolina
Department of Disabilities and Special Needs,
                    Defendants.

On Appeal From The United States District Court
For The District Of South Carolina
_____

CORRECTED PAGE-PROOF OPENING BRIEF OF APPELLANT
_____

Patricia Logan Harrison
611 Holly Street
Columbia, South Carolina 29205
803 256 2017
plh.cola@att.net
Fed. I.D. No. 6963


Kenneth C. Anthony, Jr.
Anthony Law Firm
PO Box 3565
Spartanburg, South Carolina
kanthony@anthonylaw.com
864 582 2355
Fed. Ct. No. 1132


Counsel for Appellant

# TABLE OF CONTENTS

Table of Authorities. ....................................................................................... iii

I.      Jurisdictional Statement................................................................... 1

II.     Statement of the Issues. .................................................................. 2

Issue 1.    Did the district court err in finding that Chip's claims for violations of the integration mandate of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 are moot?

Issue 2.    Have the Defendants violated Chip's rights to receive, with reasonable promptness,  services in the amount, duration and scope ordered by his treating physician and failed to establish and apply reasonable standards, and to provide services comparable to those provided in institutional settings in violation of the Medicaid Act and 42 U.S.C. 1983?

Issue 3.    Have Defendants violated Chip's Fourteenth Amendment due process rights and the notice and hearing requirements of the Medicaid Act by failing to provide reasons for the reduction, denial or termination of services in written notices, by failing to include in those notices the regulation or statute DHHS relies upon, by failing to issue final administrative orders that are appealable to the Judicial Branch within 90 days of receiving a request for a fair hearing, and may these laws be enforced under 42 U.S.C. 1983?

III.    Statement of the Case. .................................................................... 2
IV.     Standard of Review. ........................................................................ 5

V.   Statement of Facts................................................................................ 6

(1)   The MR/RD Medicaid Waiver Program. .............................. 6
(2)   Facts Related to Chip. ........................................................ 15

.   (3)   Testimony on Remand in Consolidated Case.................... 22

VI.   SUMMARY OF ARGUMENT.................................................... 30
VII.   ARGUMENTS. ......................................................................... 32

Issue 1.   Did the district court err in finding that Chip's claims for
violations of the integration mandate of the Americans
with Disabilities Act and Section 504 of the
Rehabilitation Act of 1973 are moot?. ...................................... 32

Issue 2.   Have the Defendants violated Chip's rights to receive,
with reasonable promptness,  services in the amount,
duration and scope ordered by his treating physician and
failed to establish and apply reasonable standards, and to
provide services comparable to those provided in
institutional settings in violation of the Medicaid Act and
42 U.S.C. 1983?........................................................................ 40

Issue 3.   Have Defendants violated Chip's Fourteenth Amendment
due process rights and the notice and hearing
requirements of the Medicaid Act by failing to provide
reasons for the reduction, denial or termination of
services in written notices, by failing to include in those
notices the regulation or statute DHHS relies upon, by
failing to issue final administrative orders that are
appealable to the Judicial Branch within 90 days of
receiving a request for a fair hearing, and may these laws
be enforced under 42 U.S.C. 1983?. ...................................... 48

VIII.   Conclusion...............................................................................52

TABLE OF AUTHORITIES

FEDERAL CASES

*A Society Without a Name v. Commonwealth of Virginia*, 655F.3d 342
(4th Cir. 2011). ..................................................................................... 34

*Antrican v. Odom,* 290 F.3d 178 (4th Cir. 2002). .................................... 42

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). .................................... 5

*Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268 (2006). ................ 6

*Babcock Center v. United States*, Case No. 3:11-01721 and 03155
(D.S.C. May 2, 2013). ............................................................................ 13

*Babcock Center v. U.S.* Case No. 13-2056 (4th Cir.). ............................... 13

*Blessing v. Freestone,* 520 U.S. 329 (1997). . ......................................... 41

*Bontrager v. Indiana Family & Social Services Administration*,
697 F.3d 604 (7th Cir. 2012). . .............................................................. 42

*Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979). ........................... 5

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982). ........................... 37

*Doe v. Bush*, 261 F3d. 1037 (11th Cir. 2001). .................................... 15, 43

*Doe v. Kidd I,* 501 F.3d 348 (4th Cir. 2007), cert. denied
552 U.S. 1243 (2008). ...................................................................... *passim*

*Doe v. Kidd II,* 419 F 411 (4th Cir. 2011). ........................... 35, 43, 44, 51

*Doe v. Kidd III,* Case No. 14-1428 (pending). .................................... 35, 44

*Fabula v. Buck*, 598 F.2d 869 (4th Cir. 1979). ....................................... 42

iii

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
528 U.S. 167 (2000) ................................................................. 35

*Goldberg v. Kelly*, 397 US 254 (1970). ..................................... 15, 20, 51

*Harris v. McRae*, 448 U.S. 297 (1980). ........................................ 6

*Moore v. Cook,* Case No. 1:07-cv-631 (N.D.Ga. April 19, 2012). ........................ 45

*Olmstead v. L.C.*, 527 U.S. 581 (1999) ........................................ 33, 38, 45

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013). ............................... 36, 37, 40, 42, 47

*Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3rd Cir.2004) . ......................... 42

*Shakhnes v. Berlin*, 689 F3d 244 (2nd Cir. 2012). ................................... 15

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003). ................................. 34

*Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990). ........................... 41

## FEDERAL AUTHORITIES

Fourteenth Amendment ................................................................... 2, 48

Supremacy Clause. .......................................................................... 42

ADA. ........................................................................................... *passim*

American Recovery and Reinvestment Act (ARRA). ........................................ 8

ARRA, 3(a). ..................................................................................... 8

Americans with Disabilities Act (ADA). ..................................................... *passim*

Civil Rights Act. ............................................................................. 1, 42

Medicaid Act...................................................................................... *passim*

Section 504 of the Rehabilitation Act of 1973................................................. *passim*

Social Security Act.............................................................................. 1

28 U.S.C. 1291.................................................................................. 1

28 U.S.C. 1331.................................................................................. 1

29 U.S.C. 794................................................................................... 1

42 U.S.C. 12010................................................................................. 1

42 U.S.C. 1396 ................................................................................ 1, 6

42 U.S.C. 1396a(a)(3)......................................................................... 48, 49

42 U.S.C. 1396a(a)(8)...................................................................... 15, 40, 42

42 U.S.C. 1396a(a)(10)........................................................................ 41, 42

42 U.S.C.  1396a(a)(17)..................................................................... 41, 42, 45

42 U.S.C. 1396n(c).............................................................................. 7

42 U.S.C. 1983 ............................................................................... *passim*

42 U.S.C. 1988................................................................................ 1, 52

42 C.F.R. 431.10(a)............................................................................ 6

42 C.F.R. 431.10(e)............................................................................ 6

42 C.F.R. 431.12............................................................................... 9

42 C.F.R. 431.205........................................................................... 15, 51

42 C.F.R. 431.210. ........................................................................... 26, 49

42 C.F.R. 431.211. ........................................................................... 50

42 C.F.R. 431.223. ........................................................................... 51

42 C.F.R. 431.230. ........................................................................... 15

42 C.F.R. 431.242. ........................................................................... 51

42 C.F.R. 431.244(a) ........................................................................ 50, 51

42 C.F.R. 431.244(f) ........................................................................ 15, 51

42 C.F.R. 435.911. ........................................................................... 15

42 C.F.R. 441.301-302 ...................................................................... 8

42 C.F.R. 441.302. ........................................................................... 7

42 C.F.R. 483.400 et seq. .................................................................. 7, 8

Fed. R. Civ. P. 56(c)(2) (2009). ....................................................... 5

State Medicaid Manual (SMM) at 2903. ........................................... 15

## STATE CASES

*Al Myers v. DHHS,* SC Ct. Ap. Case No. 2014-002013 (pending) ...................... 38

*Albert Cooper Myers v. DHHS*, Docket No. 10-ALJ-08-0504 (SC ALC 2011). ... 11

*Hickey v. DHHS,* (SC ALC 2011). ...................................................... 11

*Jimmy W. Eubanks, Jr. v. DHHS,* Docket No. 10-ALJ-08-0502-AP (SC ALC 2011). ........................................................................................ 11

*Michelle Morgan v. DHHS*, Docket No. 10-ALJ-08-0503-AP (SC ALC 2011) ... 11

*Peter Brown v. DHHS,* 393 SC 11, 799 SE 2d 701 (S.C.Ct.Ap. 2011). ................... 3

*South Carolina Protection and Advocacy for Persons with Disabilities v. DDSN*, SC Ct. App., Case No. 2014-00214 (pending). .................. 28

*Stogsdill v. DHHS*, Opinion No. 5271 (S.C.Ct.Ap. 2014). ........................ 37, 38, 40

*Susan Edge v. DHHS,* Docket No. 10-ALJ-08-0501-P (SC ALC 2011). ............... 11

## STATE AUTHORITIES

S.C. Code Ann. 44-6-30(1). ...................................................................... 7

S.C. Reg. 126-425(A)(9). ...................................................................... 46

# I. Jurisdictional Statement

This lawsuit was filed on March 24, 2010. The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, as the case arose under federal statutes: the Americans with Disabilities Act, 42 U.S.C. § 12010 et seq. (the "ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, the Social Security Act, 42 U.S.C. 1396 et seq. (the "Medicaid Act"); and 42 U.S.C. §§ 1983 and 1988 of the Civil Rights Act.

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291, which grants appellate courts jurisdiction to review final judgments.

The Final Judgment in this case was issued on December 10, 2014, making the following interlocutory orders appealable: that order granting summary judgment (ECF 185) for claims brought under the Medicaid Act and the Civil Rights Act; that order denying Plaintiff's motion to alter or amend (ECF 193); that order denying Plaintiffs' motion for summary judgment and dismissing Jimmy Chip E. (hereinafter "Chip") from the proceedings (ECF 231). Plaintiff filed a notice of appeal on January 8, 2015 (ECF 310). This is an appeal from a Judgment that disposes of all parties' claims.

## II.                               Statement of the Issues

**Issue 1.**   **Did the district court err in finding that Chip's claims for violations of the integration mandate of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 are moot?**

**Issue 2.**   **Have the Defendants violated Chip's rights to receive, with reasonable promptness,  services in the amount, duration and scope ordered by his treating physician and failed to establish and apply reasonable standards, and to provide services comparable to those provided in institutional settings in violation of the Medicaid Act and 42 U.S.C. 1983?**

**Issue 3.**   **Have Defendants violated Chip's Fourteenth Amendment due process rights and the notice and hearing requirements of the Medicaid Act by failing to provide reasons for the reduction, denial or termination of services in written notices, by failing to include in those notices the regulation or statute DHHS relies upon, by failing to issue final administrative orders that are appealable to the Judicial Branch within 90 days of receiving a request for a fair hearing, and may these laws be enforced under 42 U.S.C. 1983?**

## III.                               Statement of the Case

**Procedural  History.**

This lawsuit was filed on March 24, 2010 by three severely disabled persons

seeking declaratory and injunctive relief for violations of Title II of the ADA and

2

Section 504 of the Rehabilitation Act of 1973. Plaintiffs Chip and Michelle had filed administrative appeals with the South Carolina Department of Health and Human Services (DHHS).[1] ECF 207-29. Peter B. had filed an administrative appeal in 2005, which was then pending in the South Carolina Court of Appeals. *Peter Brown v. DHHS,* 393 S.C. 11, 799 S.E.2d 701 (S.C.Ct.Ap. 2011).

Plaintiffs filed a motion for preliminary injunctive relief in the United States District Court for the District of South Carolina on April 29, 2010. Chip and Michelle asked this Court for a preliminary injunctive order prohibiting DHHS from applying the caps to their services. ECF12. Peter B. requested restoration of twelve hours of adult companion hours DHHS terminated in 2009. Id.

Protection and Advocacy for People with Disabilities, Inc., the South Carolina Chapter of the National Academy of Elder Law Attorneys, and South Carolina Legal Services filed an amicus brief in support of the Plaintiffs' motion for preliminary injunctive relief. ECF 66. A hearing was held before then

---

[1] The cases of Chip and Michelle were consolidated with the appeal of Al Myers, who also lived at home when Defendants amended the waiver to cap home based services at the Administrative Law Court and a single order was issued by that Court. ECF166-4. All three of their appeals were dismissed by the DHHS hearing officer in 2010 without giving any of them a fair hearing.

3

Magistrate Judge Bruce Howe Hendricks[2] on September 28, 2010. Judge

Hendricks determined that the reductions in Plaintiffs' services placed the

Plaintiffs at serious risk of institutionalization and that the reduction in their

services violated the integration mandate of the ADA. ECF 71. District Court

Judge Michelle Childs adopted Judge Hendricks' Recommendations *in toto* and

granted Plaintiffs preliminary injunctive relief on February 1, 2011. ECF 95. That

order was not appealed.

Plaintiffs filed an Amended Complaint on May 25, 2011 and the case was

transferred to District Court Judge Timothy M. Cain on October 18, 2011. (ECF

108 and 151). On October 26, 2011, defendants Sanford and Haley filed a motion

for summary judgment. ECF 153.

The remaining Defendants filed a motion for summary judgment on March

6, 2012. ECF 169. A second amicus brief was filed by Protection and Advocacy

for Persons with Disabilities, the South Carolina Chapter of the National Academy

of Elder Law Attorneys and South Carolina Legal Services. ECF 174. Judge Cain

dismissed Defendants Sanford and Haley from all claims on June 13, 2012, but did

not dismiss the other individual or agency defendants at that time. ECF 185.

---

[2] Judge Hendrix subsequently was appointed and confirmed as a judge of
the United States District Court for the District of South Carolina in 2014.

Cross Motions for summary judgment were filed by the remaining parties in July, 2012. ECF 200 and 207.  On March 7, 2013, Judge Cain denied the motion for summary judgment filed by all Plaintiffs (ECF 207) and granted Defendants' motion for summary judgment (ECF 169 and 200) as to the claims of Chip and Michelle, finding those claims to be moot. ECF 231. He stayed the claims of Peter B. pending resolution of his state administrative action. Id.

Chip and Michelle filed an interlocutory appeal in this Court, which was denied, because of Judge Cain's stay of Peter's claims. ECF 234 and 239. Michelle died on April 18, 2014, ECF251-1. When the district court issued a final order dismissing all claims of Peter B. on December 10, 2014, Chip filed this appeal on January 8, 2015. ECF. The district court granted Chip's motion to proceed *in pauperis*. ECF324.

**IV.**                     **Standard of Review**

This Court reviews the district court's summary judgment ruling *de novo,* viewing the facts in a light most favorable to the non-moving party. *Doe v. Kidd I,* 501 F.3d 348, 353 (4th Cir. 2007), cert. denied 552 U.S. 1243 (2008). All reasonable inferences must be drawn in favor of the nonmoving party. Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

5

material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c)(2) (2009). It is the burden of the moving party to show that there is

no genuine issue of material fact and that he is entitled to judgment as a matter of

law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247 (1986); *Charbonnages de

France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). In *Charbonnages*, the court

held that "all internal conflicts" must be resolved favorably to the non-moveant and

"the most favorable of possible alternative inferences from it drawn in his

behalf."597 F.2d at 414. The nonmovant must "be given the benefit of all favorable

legal theories invoked by the evidence so considered." Id.

**V.            Statement of Facts**

**(1)    The MR/RD Medicaid Waiver Program**

Medicaid is a cooperative federal-state program to furnish medical

assistance to persons "whose income and resources are insufficient to meet the

costs of necessary medical services." 42 U.S.C. § 1396. The Centers for Medicare

and Medicaid Services ("CMS") administers the program on behalf of the

Secretary of the United States Department of Health and Human Services. States

are not required to participate in Medicaid, but all of them do. *Ark. Dep't of Health

& Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). Once a state elects to

participate in the Medicaid program, it must comply with the federal statutory and

regulatory scheme. *Doe v. Kidd I,* 501 F.3d 348, 351 (4th Cir. 2007) and *Harris v. McRae*, 448 U.S. 297, 301 (1980).

The Medicaid Act and its regulations require each State to specify a single state agency designated to administer the Medicaid plan. 42 C.F.R. § 431.10(a) and (e). In South Carolina, DHHS is the state agency designated to administer and supervise all Medicaid programs. S.C. Code Ann. § 44-6-30(1). The Director of DHHS is currently Christian Soura, who succeeded Anthonly Keck. The director of DHHS is appointed by the Governor, who also has the authority to fire the director.

South Carolina participates in optional Medicaid programs, called "home and community based waiver programs," which allow persons who would otherwise require institutional care at taxpayer expense to receive services in the community instead. 42 U.S.C. 1396n( c). DHHS contracts with the South Carolina Department of Disabilities and Special Needs (DDSN) to administer a Medicaid waiver program that provides home and community based services to persons who have "intellectual disabilities" (formerly called "mental retardation"[3]) or "related

---

[3] The name of the program has been changed to the ID/RD Medicaid waiver program, but the definition and criteria is the same. As the district court did, in this brief, Plaintiff will use the terminology used when this lawsuit was filed, i.e. "MR/RD Medicaid waiver program." ECF 231, fn 3.

disabilities," such as cerebral palsy or epilepsy.[4]

In order to qualify for the MR/RD Medicaid program, the participant's disability must be severe enough to meet the stringent "level of care" requirements for institutional care. ECF207-22@3 of 197 and 42 C.F.R. 441.302, 483.400 et seq. In other words, Chip's condition had to be severe enough to qualify for him to be admitted, at taxpayer expense, to the type of facility that is most restrictive and expensive, an ICF/MR.[5] ECF 12-25. As required by federal law, each year, DHHS has certified to the federal government that Chip meets ICF/MR level of care and that he has been provided his choice of receiving services in an ICF/MR or home-based services through the MR/RD Medicaid waiver program. 42 C.F.R. 441.301-302.

The federal government provides approximately 70% of the funds for the MR/RD Medicaid waiver program, except between October, 2008 and December, 2011, the federal match rate for South Carolina was increased to approximately

---

[4] DDSN is governed by seven Commissioners appointed by the Governor, who has the authority to remove Commissioners. The Director of DDSN is Beverly Buscemi. William Danielson is the current Chairman of the DDSN Commission.

[5] "ICF/MR" (now "ICF/ID") refers to an "Institutional Care Facility/Mental Retardation" which is an institution which provides "active treatment" to severely disabled persons who have  mental retardation or a related disability. 42 C.F.R. 483.400 et seq.

80%, thus reducing the state funds needed to maintain the same level of services by approximately 1/3. ECF 80-3. The American Recovery and Reinvestment Act ("ARRA") was enacted by Congress on February 19, 2009 "to preserve and create jobs and to promote economic recovery; assist those most impacted by the recession.. and  stabilize state and local government budgets in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases." ARRA, §§ 3(a). ECF80-2.

Federal law requires each state establish an advisory committee, called the "Medical Care Advisory Committee" in South Carolina, but their recommendations are only advisory. 42 C.F.R. 431.12. DDSN administers the MR/RD Medicaid waiver program under contract with DHHS. ECF 231 at 3.

Prior to 2010, there were no caps on Medicaid waiver services. The cost of services provided to some waiver participants exceeded the cost of ICF/MR services and some waiver participants received one-on-one "enhanced staffing."[6] ECF 44-10 at 312.  DHHS filed the waiver amendment with CMS and receive approval, after the General Assembly recessed in June 2009, and received CMS approval during the legislative recess.  ECF44-13 and ECF251-5. The director of

---

[6] One DHHS audit documented Medicaid allowed waiver costs of $158,921 for one individual participant in 2003 (not counting cost of room and board). ECF44-10 at 312-315.

9

DDSN informed CMS that "Due to the State of South Carolina's budget situation, SCDDSN opted to make minor adjustments to the MR/RD waiver program." ECF207-23. CMS records showed that the cost of the MR/RD Medicaid waiver program for 2009 was projected to be $225,153,158. ECF 251-4. (2009 was "Year 5" of the MR/RD Medicaid waiver cycle. See ECF207-21.) But, DHHS informed CMS that the cost of the waiver program for 2010 would increase to more than $278 thousand, an increase in cost of more than 20% when home based services were reduced. ECF 123-7 and 251-5.

Waiver participants received notice in December, 2009 that effective January 1, 2010, DHHS caps would be placed on personal care attendant services, adult companion services, respite services and nursing services. ECF207-23. Under the new rules, waiver participants would be limited to receiving 28 hours a week of personal care attendant and adult companion services (combined). Id. DHHS also terminated speech and language, physical therapy and occupational therapy as MR/RD Medicaid waiver services. ECF207-23.

After these changes were made, only waiver participants living in congregate facilities could receive around-the-clock care or more than ten days a month (240 hours) of respite services. Although in-home respite services were limited to 68 hours a month, respite services provided in DDSN institutions were

10

unlimited under the amended waiver.[7]

These changes were submitted to CMS in the summer of 2009, after the General Assembly adjourned in June and they went into effect before the General Assembly reconvened in January, 2010. The waiver amendments established binding norms, but they were enacted without promulgating regulations. ECF44-13. *Hickey v. DHHS* at 207-14 (SC ALC 2011). *Susan Edge v. DHHS*, Docket No. 10-ALJ-08-0501-P (SC ALC 2011), *Jimmy W. Eubanks, Jr. v. DHHS*, Docket No. 10-ALJ-08-0502 (SC ALC 2011), *Michelle Morgan v. DHHS*, Docket 10-ALJ-08-0503-AP (SC ALC 2011) and *Albert Cooper Myers v. DHHS*, Docket No. 10-ALJ-08-0504 (SC ALC 2011).

Only 200 out of the 5,792 MR/RD waiver participants (3.4%) were receiving more than 28 hours a week of personal care attendant services when these caps were imposed. ECF174-4@¶7. Only 35 out of those 200 participants filed appeals. ECF174-4 at ¶5. According to the director of DDSN, most of these 200 individuals, like Chip and Michelle, "lived with aging parents, most with only one primary caregiver." Id. at ¶8.

Defendant Buscemi (current director of DDSN) informed the district court

---

[7] The amended waiver allowed respite services to be increased, on a temporary basis, up to 240 hours a month, if approved by DDSN. ECF207-19 at 20.

that:

> The reasons for such limits was to insure that within those limits, similarly situated individuals would be able to receive comparable services, based upon a standardized assessment conducted by the service coordinator rather than having the services offered unevenly. An additional reason was to deal with severe state budget reductions that had occurred, beginning with the 2008-2009 fiscal year and continuing through the present.

ECF71-1at ¶6. The director of DHHS said in her affidavit that "these limitations on services represent a fair and equitable way to reduce superfluous and redundant services" and that the limits "represent responsible stewardship and use of public funds, and that they maximize and efficiently monitor the services that can be provided to these populations." ECF 19-2 at ¶¶10 and 12. Deputy Director of DDSN, Kathi Lacy informed the court that "Part of the reason for establishing these caps was to deal with severe state budget reductions that had occurred in the 2008-2009 fiscal year." ECF19-3 at ¶7. But, the cost of the waiver program, after these caps and service terminations were enacted, actually increased by more than $53 million. The average cost per waver participant in 2009 was $36,209 (ECF12-13) but this per participant annual average cost, after these home-based services were reduced or terminated, increased in 2010 to $44,232. ECF12-14. Judge Hendricks reported that the services Chip was receiving in the community during 2010 cost $39,424.25, which was approximately one-third of the cost of

12

institutional services.[See Doc. 44-10 at 269.] ECF 73. His care in an institution would cost "approximately $116,000.00 a year." Id. See also ECF 12-25@3 (the <u>average</u> cost of institutional care in 2008 was $320 per day, or $116,800).[8]

On August 3, 2009, after state legislators left Columbia at the end of the legislative session, the director of DDSN appeared before the South Carolina Budget and Control Board. ECF 12-17 at 5, 7-13. He requested that Board's permission to spend $5,944,738 to buy workshops for three providers out of a $7.8 million excess funds account DDSN was holding. ECF12-17 at 5-13. These expenditures were not included in the State Budget passed by the General Assembly in June or otherwise authorized by that legislative body. Two of these providers were local DSN Boards and the third was a private corporation.[9] Case

---

[8]  A report issued by the South Carolina Comptroller at the end of reported that DHHS spent just $2,170,909,331 out of the $2,396,091,331 it received in FY 2010, allowing more than $225 million "lapse." ECF160-18 at 6. There was tremendous controversy at the end of 2010 and  2011 about just how Medicaid funds had been spent (after these service cuts at DDSN went into place). ECF160-1, 14, 21, and 24.  Two DHHS officials left the agency to work for an out-of-state corporation who DHHS Director Keck reported had overbilled Medicaid by $10.5 million.

[9] The Budget and Control Board authorized DDSN to pay $800,000 to a private corporation, the Babcock Center, to purchase a workshop. ECF12-17 at 8. During 2008, the corporation had "maxed out" its lines of credit. Case Nos. 3:11-01721-CMC and 3:11-03155-CMC at 2 (D.S.C. May 2, 2013). *Babcock Center v. United States*, Case No. 3:11-01721 at 12. This Court may take judicial notice of the appeal the Babcock Center filed from the jury verdict finding that it willfully failed to pay employment taxes. *Babcock Center v. U.S.*, Case No. 13-2056 (4th

13

Nos. 3:11-01721.CMC and 3:11-03155-CMC at 2 (D.S.C. May 2, 2013). The

Budget and Control Board gave DDSN permission to spend $3.2 million of these

excess funds to purchase these three properties, $100,000 on a consulting contract

and to pay the Budget and Control Board $3.2 million. None of these expenditures

had been approved by the General Assembly and they were not in the State

Budget. ECF 12-17 at 5.

An audit released by the South Carolina Legislative Audit Council in

December, 2008 had criticized DDSN for failing to spend tens of millions of

dollars that had been allocated by the General Assembly to provide services to

disabled Medicaid waiver participants, spending much of that money buying real

estate without legislative approval instead.[10] ECF 12-8. Other audits produced

---

Cir.). The district court found that most of the funds Babcock Center received
came from DDSN. Id.  In 2009, the Babcock Center failed to pay employment
taxes for "eleven of the previous twelve quarters" that year." Fn 22.

[10] During the three year period covered by that audit, the LAC audit reported
that DDSN paid more than $23 million in "capital grants" not authorized by the
General Assembly. Id.@57. DDSN spent just $7.6 million of the $25.4 million
appropriated by the General Assembly for new residential services, thus losing the
matching 70% federal funds because the money was not spent providing services it
was supposed to provide. Id.@56. Out of the $10.5 million appropriate by the
General Assembly to provide services for children with autism in FY07 to FY08,
DDSN spent only $671,917 for services, again losing the federal match on the
funds not spent providing services. Id.@59. The LAC audit of DDSN showed that
the agency gave $96,000 to the Babcock Center to buy furniture and forgave $2
million of debt owed by the Babcock Center the year it required that private
corporation to downsize its residential program by 50% due to concerns about the

14

similar findings, as well as reports of chronic problems showing that clients were subjected to abuse and neglect. ECF44-10,160-2, 160-7, 160-8, 160-9. See also letter from former Internal Auditor of DDSN at ECF160-10

Federal regulations require DHHS to maintain services, without reductions, to waiver participants who file an appeal within 10 days of receiving notice of the adverse action.  42 C.F.R. 431.230. To effect an appeal, the waiver participant must first request reconsideration by the director of DDSN, who has 10 days to respond. ECF 19-3 at 26. Then the disabled person must file an appeal with the DHHS Office of Hearings and Appeals within 30 days. Id. Adverse decisions from DHHS are appealed to the South Carolina Administrative Law Court. An adverse decision in the ALC may be appealed to the South Carolina Court of Appeals.

DHHS hearing officers often dismiss these appeals without providing an evidentiary hearing. ECF169-2, 4, 220-10, 175-8 and 281-1. Federal regulations prohibit the State from dismissing a fair hearing appeal, except when the Medicaid participant requests dismissal in writing, or fails to appear at a hearing without good cause. 42 C.F.R. 431.223.  Due process standards established by the United States Supreme Court in *Goldberg v. Kelly* are specifically incorporated into

---

safety of clients there. ECF12@12and37-38. Then DDSN gave Babcock Center a $2.4 million "infrastructure grant" to buy a new administrative building. Id.@57.

federal Medicaid regulations in 42 C.F.R. 431.205. 397 U.S. 254.  Federal

regulations require the State to issue a final administrative decision with

"reasonable promptness," which has been interpreted by this Court and the Second

and Eleventh Circuits to mean within 90 days. *Doe v. Kidd I supra, Doe v. Bush*,

261 F3d. 1037, 1061 (11th Cir. 2001), *Shakhnes v. Berlin,* 689 F.3d 244, 247 (2d

Cir. 2012). See also 42 U.S.C. 1396a(a)(8), 42 C.F.R. 435.911, 42 C.F.R.

431.244(f) and the State Medicaid Manual at § 2903.

**(2)    Facts Related to Chip**

Plaintiff Chip has profound cerebral palsy and is unable to use his arms or

his legs. ECF 44-2 (Aff. of Dr. Barnard). Chip is able to drive his wheelchair with

his mouth. He requires assistance with all activities of daily living and is unable

speak so that other persons understand what he is saying. ECF44-1 and 3, 175-4

and 5.  He needs total assistance with all activities of daily living. Id.  Chip's legs

have to be strapped to his wheelchair due to spasticity. ECF175-4. It takes two

people to lift him into the tub due to his spasticity. ECF 175-5. He has painful boils

on his skin and has chronic spasms in his legs. ECF 175-5 and 207-26.

Chip's mother, who was his primary caregiver, died after this lawsuit was

filed and then "things fell apart." ECF 175-5. He lives with his father, who has a

degenerative disc in his back. Id., 175-5. Sometimes Chip has to sleep in his

16

wheelchair when no one is available until the PCA arrives in the morning, because his father is unable to lift him. ECF 44-8, 175-4 at ¶¶25-26 and 175-4 and 5.

Defendant Lacy informed the district court in her affidavit dated May 17, 2010 that Chip was receiving 56 hours a week of personal care attendant services, but, he was only receiving only 52 hours a week of those services. ECF10-3 at ¶16 and ECF44-2 (Service Coordination Report dated May 21, 2010 at 55). Chip stated on August 16, 2012 that "when I have requested additional personal care services, my DDSN service coordinator has told me that my personal care, companion and respite services will not be increased while this litigation is pending, regardless of my need for additional hours." ECF207-27. He said that "I get really depressed when I think about what is going to happen to me and I feel like I am a burden on my family." Id.

Despite Chip's severe disabilities, he is a volunteer coach with the Clinton High School Football team. Id. He described that work and being with his family as "the only bright spot in my life" and that would be taken away from him if he had to move into a group home or institution. Id. He described the possibility of having to be admitted to Whitten Center (an ICF/MR) as his "biggest fear" because of the abuse and neglect there. Id.

Chip's DDSN service coordinator sent him a "Notice of Reduction of

Service" dated December 30, 2009, notifying him that his personal care services would be reduced from 52 hours a week to 28 hours a week, to be effective that same day. ECF 44-1 at 28. The stated reason for reducing his personal care attendant services was "DDSN has capped this service to 28 hours per week." Id. The notice did not contain any other explanation for reducing his services, nor did it contain the regulation or statute DDSN and DHHS relied upon to reduce his services. Chip filed an appeal within ten days of receipt of the December 30, 2009 "notice," so the number of hours he was receiving prior to January 1, 2010 were restored during his administrative appeal.

Defendant Buscemi denied Chip's motion for reconsideration on January 11, 2010, informing him that:

> These approved limits cannot be exceeded and must be applied to all MR/RD Waiver participants....While we understand and appreciate the hardship these changes may cause, we are not at liberty to exceed the established limits.

ECF 19-3@25.

Chip then filed an appeal with the DHHS Office of Appeals and Hearings, requesting a fair hearing on May 17, 2010. ECF166-14. The DHHS hearing officer dismissed Chip's appeal more than 90 days after he requested a fair hearing, on April 29, 2010, without providing an evidentiary hearing. Chip filed an appeal with

18

the South Carolina Administrative Law Court (ALC) on June 18, 2010. Id. At the

ALC, Chip's case was consolidated with appeals filed by three other DDSN waiver

participants whose services had been reduced. Id.

In May, 2010, after Chip filed this lawsuit in the federal district court,

DHHS increased Chip's respite hours by 12 hours a week.[11] ECF 44-3. But, Chip is

often not able to utilize those respite hours, because he cannot find anyone to work

at the low rates paid by DDSN for that service and because of other obstacles

imposed by DDSN on the use of respite services. ECF 44-3, 175-4, 175-2 ¶¶55-58,

175-5 and 207-26. DDSN pays $16 an hour for personal care attendant services,

but only pays $10.50 an hour for respite services.[12] Respite caregivers frequently

quit due to the low rate of pay, and,  it can take months to find a replacement.[13]

ECF 175-5.

The only alternatives DDSN offered Chip were for him to attend a

congregate day program where he would spend his day in a DDSN workshop with

---

[11] According to Chip's caregiver, Amber Plia, DDSN did not provide any benefits, even worker's comp or unemployment benefits, to respite caregivers. ECF 44-3.

[12] These are the rates paid to providers. ECF207-20 at 35. The caregiver is not paid this amount.  Id. at 37.

[13] The LAC audit confirmed the lack of respite providers, finding that in 2008, there were just 18 respite providers on the list for Richland and Lexington Counties to serve 2,280 consumers eligible for those services. ECF12-7@41.

other disabled persons or to be admitted to a congregate residential program.
ECF44-3.  Profits from the labors of "mentally retarded trainees" at these
workshops are paid to DDSN. ECF 12-12. Chip's physician and psychological
support provider agreed that it would be inappropriate for Chip to be placed in a
congregate day program, where he would be segregated from non-disabled persons
and would not be able to defend himself. 44-2 and 175-2 at ¶54.

Of all three of the original plaintiffs, Judge Hendricks found that "the
prospect of institutionalization is most terrorizing to him." ECF73. The district
court found that "there has been a diminution in service hours for both Chip and
Michelle, which, as will be discussed, their treating physicians find significant."
ECF 73. DHHS did not file objections to the Recommendations of the magistrate
and they did not appeal the decision of Judge Michelle Childs adopting that
Report.

Nearly a year after the district court issued a preliminary injunction, the
ALC reversed the decision of the hearing officer on November 9, 2011, finding
that CMS' approval of the MR/RD Medicaid waiver "does not have the force and
effect of law because the waiver reduction was not promulgated as a regulation."
ECF207-29 at 14. The ALC also ruled that DHHS was required to comply with the
standard established by the United States Supreme Court in *Goldberg v. Kelly* by

providing an evidentiary hearing before reducing a waiver participant's services. 397 at 268-269. The ALC remanded Chip's case back to DHHS in an unappealable interlocutory order. ECF207-29 at 16.

On remand, DHHS scheduled hearings on all four appellants in the consolidated case during the first week of January, 2012. But, the DHHS hearing officer then again dismissed Chip's and Michelle's appeals without providing the evidentiary hearing, finding that their services had not been reduced. ECF 169-4 at 4.

Defendant Buscemi informed the court that Chip's services will be "subject to annual review and re-evaluation." ECF169-3@¶5. She told the district court in 2012 that "There are no plans to conduct that review of those Plaintiff's services for at least six months, which means that no change in those Plaintiffs services will take place for at least that long." Id. She also stated that DDSN and DHHS "do not presently plan to promulgate as regulations the service caps ...." Id. The director acknowledged that those service caps "cannot be applied" to Chip as a result of the ALC order, but it is obvious that DDSN and DHHS interpret that order as allowing them to enforce the caps if they first provide an evidentiary hearing.  Defendant Buscemi stated in her affidavit that if Chip's services were to be reduced, he would be given "the usual notice and opportunity to be heard..." ECF 169-3 at ¶7.

Defendants have continued to cap Chip's respite services at 240 hour a month and, at the time the district court dismissed Chip, Defendants had refused to increase his personal care services above the 52 hours a week he was receiving in 2009. ECF207-26.

Chip's treating physician determined that he requires personal care attendant services during all waking hours (at least 116 hours a week) and he needs a caregiver to be present in the house at all other times. ECF44-2. The only evidence from a medical source Defendants provided in the record is an affidavit signed by Graeme Johnson, a physician who works as a consultant to DDSN. ECF214-1.  Dr. Johnson never met Chip and has not reviewed his medical records, but reviewed the affidavits filed in this case. Id. The only opinion Dr. Johnson provided as to Chip is as follows:

> Based on my review of the affidavits filed in this case with respect to Chip E, including those that describe his medical condition and the services now authorized for him, it is my opinion that if Chip continues to receive the level of PC II and respite services presently authorized (about 15.4 hours a day), those services will satisfactorily address his medical needs. If Chip's condition were to change, or if circumstances were to require DDSN or DHHS to reduce the authorized service levels (and the latter is not contemplated), I would need to review any such changed circumstances before reaching a medical opinion.

ECF214-1@P8. Dr. Johnson's affidavit states that "I am also informed that there are *presently* no plans to reduce those services." Id. (Emphasis added.)

22

**(3)** **Testimony on Remand in Consolidated Case**

DHHS dismissed each of the appeals of Chip, Michelle and another waiver participant, Al Myers, in 2010 without giving any of them an evidentiary hearing. They filed separate appeals with DHHS challenging the changes made to the waiver program. The appeals of Chip, Michelle and Al were consolidated by the the South Carolina Administrative Law Court into one case and a single order was issued by that court, based on the evidence presented in all three appeals. ECF166-44. On remand, the DHHS hearing officer scheduled hearings for Chip, Michelle and Al. But DHHS once again dismissed Chip's and Michelle's administrative appeals, without providing the requested hearing. DHHS dismissed Chip's and Michelle's appeals, promising only that they would not reduce their services for six months. ECF169-3. But DHHS notified Al Myers that only <u>his</u> services would be reduced and it scheduled a hearing on his appeal. ECF175-8.  The only difference between Al's and Chip's circumstances was that Chip had filed a lawsuit in federal court and had the protection of that court while his federal lawsuit was pending.

Although Al Myers is not a party to this federal lawsuit, because DHHS did not give Chip and Michelle an opportunity to cross examine DDSN and DHHS witnesses about the process Defendants used to place caps on services (such as binding norms and failure to promulgate regulations and the standards DDSN and

23

DHHS use to determine medical necessity and to award hours), Chip introduced evidence from Al's evidentiary hearing into the record in the district court and some of those records are included in the record on appeal to this Court.[14]

Al had been receiving 45 hours a week of personal care attendant services in 2009 and, like Chip, he continued to receive those services while his administrative appeal was pending. ECF175-9 at 4. On remand from the ALC, though, DHHS informed Al that it intended to proceed with process of reducing Al's hours. ECF175-8.Al's mother referred to the cuts DHHS continues to make as "death by one thousand cuts," because the time and monetary constraints imposed by repeated reductions in waiver services has exhausted her capability to file appeal after appeal. Id at P.12 and 13.  Her affidavit also shows that, like Chip, Al was unable to find respite caregivers willing to work for the rate paid by DDSN. Id. at P22. Al and his mother finally "lost the battle to keep Al at home in December 2011" and he entered a nursing home. Al's mother stated in her sworn affidavit that "It was not my choice to place Al in the nursing home, but I could not fight them, being worried every day when his home-based services would be cut." Id. at P26.

---

[14]  These documents demonstrate the futility of the administrative process in fashioning a remedy for Chip. The testimony presented at Al's hearing also supports Chip's claims for violations of the Medicaid Act (reasonable promptness, reasonable standards, etc.) so it is presented in this brief to assist the Court in understanding the risk of the caps being imposed on Chip in the future.

24

At Al's evidentiary hearing held on January 6, 2012, DHHS did not produce any evidence or testimony from any qualified medical source (or any medical source whatsoever). ECF 175-2 at ¶42 and 166-14. At the time of that hearing, Janet Priest, who has no medical training, was the DDSN official responsible for administration of the MR/RD Medicaid waiver program. ECF207-20@7 and 17. Ms. Priest testified that no MR/RD waiver participant may exceed waiver limits, ignoring the finding in Chip's consolidated case that the caps constitute a binding norm that may not be enforced without promulgating regulations. Id. at 20. Ms. Priest testified that DDSN service coordinators have the authority to override physicians' orders and that DDSN had no intention to promulgate regulations (which are needed to establish "reasonable standards"). Id. at 23-24.

Ms. Priest read into the record the letter from Dr. Buscemi denying Al's request for reconsideration which said "as you may know over the last year, DDSN has suffered devastating budget reductions. As a result of those reductions limits caps were placed on services in the MR Waiver." Id. at 28. (This language was not included in the letter Dr. Buscemi sent to Chip denying his request for reconsideration.) But, DHHS failed to make any arguments at Al's hearing that services had been reduced due to lack of funding, the reason he had been given for reducing his services. ECF175-12 and 175-8. Al had prepared his case based on the

understanding that he needed to present evidence that the caps were established due to lack of funding.[15]

Ms. Priest testified that DDSN teaches service coordinators not to give any deference to physicians' orders. Id. at 29. According to her testimony, DDSN does not consider medical necessity for services and only the service coordinator can assess and determine the number of hours the waiver participant needs. Id. at 30 and 31. DDSN trains service coordinators to give the same weight to physicians' orders that they give to opinions of teachers, parents "or familiar caregivers." Id. at 32.

Ms. Priest did not know whether respite caregivers were provided worker's comp insurance and admitted the agency had not conducted a study to determine whether the rates paid to respite workers were sufficient to enlist providers. Id. at p.38-39.

Kara Lewis, who also has no medical training, was the "Waiver Coordinator" responsible for administering the MR/RD Medicaid waiver program DHHS. 207-21 at 81 and 85. Ms. Lewis testified at Al's fair hearing that "there

---

[15]   This spotlights the harm caused by Defendants' ongoing violation of 42 C.F.R. 431.210 and the untenable position waiver participants face when they are ambushed at fair hearings, with no warning of the reasons for the adverse action that DHHS' attorneys will argue when the waiver participant arrives at the hearing.

were many reasons" for the changes in the MR/RD Medicaid waiver made in 2010

and these changes were made because:

> ...there were assessments done by DDSN that they felt like services were not being applied properly to - according to the definitions of the services in place and there were services being over utilized or services being misutilized.

Id. at 86. None of these reasons had been provided to Al (or to Chip), so he was not

prepared to present evidence to refute these new "reasons" for capping services.[16]

Ms. Lewis stated that the notice of reductions that was sent to families in

December, 2009 was "just a courtesy announcement..." that did not identify the

regulations or the law upon which DHHS relied upon to make these changes. Id. 87

and 88. She testified that the changes did not constitute a "policy, rule or

regulation" and admitted that DHHS is required to give waiver participants notice

of the law it relied upon in reducing services. Id. at 88.

When asked about the cases where the ALC held that the caps were

unenforceable, Ms. Lewis could not "speak about any decisions with any

authority." Id. at 90. She testified that DHHS did not consider whether the changes

to the MR/RD Medicaid program in 2010 would comply with the Americans with

---

[16] DHHS rules do not provide for discovery to be taken in administrative appeals.

Disabilities Act. Id. at 92. She was not aware the fact that the district court had determined that the caps violated the ADA (in the preliminary injunction order). Ms. Lewis testified that DHHS felt confident that it was in compliance with the ADA in making these changes because CMS had approved the waiver document "with virtually no bullet back." Id. at 93.

When asked what the Medicaid Act required about providing services with "reasonable promptness," Ms. Lewis testified "I don't even know what you're talking about." Id. at 96. Ms. Lewis later testified that she thought that DHHS may be required to provide services within "either 45 or 90 days." Id. at 96. She admitted that requiring a waiver participant to wait six months before receiving a service was not reasonable. Id. at 97.

Like Ms. Priest, Ms. Lewis testified that DHHS does not "use medical criteria" to assess the need for waiver services, confirming Ms. Lewis' opinion that "This Waiver is not based on medical necessity." Id. and 98. She also testified that service coordinators do not give any particular weight to the opinion of treating physicians. Ms. Lewis admitted that DHHS does not have regulations to determine the weight that must be given to the opinion of the physician, and it did not intend to promulgate regulations Id. and 99. When asked about promulgating regulations for the administration of the DDSN waiver programs, Ms. Lewis responded "We

28

didn't have any ideas" and "I don't know enough about it to give you an intelligent answer to tell you the truth." Id. at 101.

South Carolina Protection and Advocacy for Persons with Disabilities and seven disabled individuals filed a lawsuit against DDSN in 2007 simply asking the agency to promulgate regulations.[17] ECF174-1. Ms. Lewis, who is the DHHS official responsible for coordination of the MR/RD Medicaid waiver program was not aware of that lawsuit. ECF207-21 at 102.

Al presented an affidavit from his treating physician at the fair hearing stating that it was unsafe for him to attend the workshop and that reducing his services would cause him to be institutionalized. Id. Based on her experience as the leader of a grass roots advocacy organization and the arguments DDSN officials made at Al's "fair hearing," Al's mother felt that "it is likely that the agencies will terminate Michelle's and Chip's services if their federal lawsuit is dismissed." Id. at P 67. She stated that "Al's needs are similar to theirs and their services will be reduced if DDSN/DHHS apply the same standards they have applied to Al." Id. at P68. She said that "It is common for DDSN to take actions using a pretext in order to reduce or eliminate services." Id. at P69. Al's mother also said that "I have

---

[17] This Court may take judicial notice that P&A's lawsuit is pending in the South Carolina Court of Appeals. Case No. 2014-00214.

become aware that it is common for DHHS to refuse to provide a fair hearing when one is requested by a waiver participant." Id. at 70. According to Al's mother: "In most cases, DHHS fails to inform the waiver participant of the regulation that supports the reduction and they fail to provide a decision within 90 days." Id. at P71.

The DHHS hearing officer determined in her orders dated February 9 and March 19, 2012 that Al only needed 28 hours a week of personal care services. This just happened to be the number of hours allowed by the caps established in 2010, but Al's needs and condition had not improved since Defendants determined (for years) that he needed 45 hours a week of personal care services. ECF175-9 and 10. Citing no medical evidence to support reducing Al's services, the hearing officer ruled that services "seem to be available in a sufficient amount to cover the Petitioner's daily needs" and that the waiver reductions amounted to "only a reconfiguration in services which were still sufficient to meet his needs." Id. at 9 and 10. The order acknowledged that DHHS could not treat the caps as "binding norms," but concluded that DDSN and DHHS "had the authority" to "limit or exclude services from the Waiver in the renewal" and that Al's needs "could be adequately met within the new Waiver limits." Id. at 10 and 11. The order did not attempt to explain the contradiction between the opinion of Al's treating physician

(which was listed in the order as evidence) and the decision that the number of hours his physician ordered were not necessary.

VI.                          **SUMMARY OF ARGUMENT**

Chip has profound physical disabilities, but normal intelligence and he has always lived at home. He is a volunteer coach for the local high school football team, where he is treated as a respected member of the community. ECF44-6. Chip depends upon caregivers to assist him with every activity of daily living. He cannot walk, talk so that others can understand him, or even put food to his mouth.  He spends his days, and sometimes his nights, in a motorized wheelchair that he is able to drive with his mouth, because he has no use of his arms or legs.

Chip participates in a Medicaid program that allows severely disabled people who do not want to live in an institution to receive services at home. It is called a "waiver" program, because it is designed to allow people like him to live in their home and communities, instead of receiving these services in an institution. This program saves taxpayers money, because the aggregate cost of the program is significantly lower than serving the same persons in institutional settings.

In 2010, based on the pretext of "budget reductions" the state agencies that administer this program established caps on these services and the district court found that imposing those caps on Chip would cause him to be institutionalized.

31

Later, Chip learned that the State's claim of lack of funding was a hoax to force disabled people like him into congregate workshops where DDSN profits from the labors of "trainees." ECF12-12. Instead of having less money to spend providing services, when Congress passed the federal stimulus act (ARRA), the state had more money, because its Medicaid matching rate was significantly reduced. Prior to 2010, South Carolina had to provide approximately 30% of the cost of Medicaid services, but during the "stimulus years," it only had to provide a 20% match. Instead of using these stimulus dollars to provide services to persons like Chip, as intended by Congress, South Carolina used the money for other purposes.

The South Carolina Administrative Law Court found that these caps were unenforceable, because they had not been promulgated as a regulation. But DHHS continues to impose the caps on all Medicaid waiver participants who did not file a lawsuit in federal court. The Director of DDSN has acknowledged that Chip will be reevaluated and he alleges that he is at risk of his services being reduced again. The State has only promised that it will not reduce Chip's services for six months.

Chip has alleged that the State has violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 and that his claims are not moot by Defendants' voluntary temporary cessation of its illegal practices.

He also alleges that Defendants have violated the Medicaid Act by failing to

32

provide services with reasonable promptness and in the amount, duration and scope ordered by his treating physician. He alleges that Defendants have failed to establish and apply reasonable standards in operating this program and that all of these violations of the Medicaid Act are enforceable under § 1983. Finally, Chip alleges that Defendants have violated his right to due process that is guaranteed by the Fourteenth Amendment by providing deficient notices, failing to provide due process hearings and failing to issue decisions and provide services with reasonable promptness and that these violations also may be enforced under 42 U.S.C. 1983.

Chip asks this Court to reverse the district court and to grant his motion for summary judgment.

## VII.                    ARGUMENTS

**Issue 1.      Did the district court err in finding that Chip's claims for violations of the integration mandate of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 are moot?**

Chip requested an order "directing Defendants to provide all home and community based services which are determined by participants' responsible treating physicians to be medically necessary, so long as the cost of these services is less than the cost of their care in a Regional Center..." The district court found that Chip is receiving the relief he requested and granted the Defendants' motion

33

for summary judgment on the ground of mootness. The premise for the finding of mootness is manifestly incorrect. This conclusion ignores Chip's affidavits, and those of his physician, his sister and psychological services provider that he continues to need the personal care attendant and other services ordered by his physician. It is undisputed that Defendants have not provided those services ordered by Chip's physician. Therefore, Defendants' violation of Chip's rights under the ADA and Section 504 are continuing.[18]

The Fourth Circuit ruled in *A Society Without a Name* that "to establish a continuing violation[,] the plaintiff must establish that .. .an illegal act was a fixed and continuing practice." 655 F.3d 342 (4th Cir. 2011). Chip has shown in the affidavits and other evidence he provided to the district court that these violations are continuing.

Then magistrate Judge Hendricks recognized, that Chip has met all three elements of his ADA claim by proving that he (1) is a "qualified individual with a

---

[18] Judge Hendricks recognized the obligation to give deference to the treating physician in her recommendations: "But certainly, if anyone knows what might be the best, among many less than perfect alternatives, it is the plaintiffs, their families, and their physicians. To credit those accounts, earnestly, seems in keeping with the manner in which these cases are to be considered. *See Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring) ("The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference.")" ECF71@7.

34

disability;" (2) was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. ECF 73. *See Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003). The order of the district court, which adopts Judge Hendricks' findings was not appealed.

In granting summary judgment to the Defendants, the district court found that restoring the number of hours Chip was receiving in 2009 cured Defendants' violation of the ADA and Section 504. This finding fails to address the evidence of Chip's current needs. The affidavit of Chip's physician establishes that his needs exceed the number of hours he was receiving in 2009. Defendants presented no evidence that they are providing the services that Chip's treating physician determined that he needs.

This Court recognized in *Doe v. Kidd I* that where "a defendant's voluntary conduct is the basis for the potential mootness, it is 'well settled that [the] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" 501 F.3d 354, citing *Friends of the Earth, Inc. v. Laidlaw Environmental*

*Services* (TOC), Inc., 528 U.S. 167, 189 (2000). Chip's claims brought under the ADA and Section 504 are not moot, because Defendants have not met this high burden.

In *Doe v. Kidd*, the same agency defendants twice convinced the district court in South Carolina to grant summary judgment on the grounds of mootness, each time contending that the MR/RD waiver participant was receiving the relief due her. Each time, this Court reversed. *Doe v. Kidd I*, *supra* and *Doe v. Kidd II,* 419 Fed.Appx. 411 (4th Cir. 2011). This Court may take judicial notice of its docket that shows that the services this Court ordered DDSN and DHHS to provide to Doe in 2011 were not actually provided after Doe appealed the district court's third dismissal of her case.[19] *Doe v. Kidd III,* Case No. 14-1428 (pending). Similarly, the finding of mootness should be reversed in this case because the services to which Chip needs have not been provided.

The affidavit of Chip's treating physician states that due to the severity of his disability, Chip needs personal care attendant services during all waking hours and needs to have someone available during sleeping hours. ECF44-2. Obviously, to assure his safety, Chip must have someone available during the night who can

---

[19] Dkt. No. 29-2 in *Doe v. Kidd III* shows that DDSN and DHHS finally began to provide Doe with residential habilitation services ordered by this Court in 2011 in 2014, after she filed her third appeal in this Court.

36

lift him out of the bed, turn him to avoid decubitus ulcers and provide incontinence care, which his father cannot do.[20] ECF174-4 and 5. Those medically necessary services have still not been provided, placing Chip at risk of institutionalization. Therefore, his claims are not moot.

Assuming, *arguendo* that Chip is presently receiving the services due to him, this case is similar to *Pashby v. Delia*, in which this Court ruled that the North Carolina Medicaid Agency's voluntary cessation by providing personal care services to disabled Medicaid waiver participants did not moot their lawsuit because the State remained free to reassess their needs and to terminate their in-home personal care services. 709 F.3d 307, 316 (4th Cir. 2013). As in that case, Defendants have not met their high burden of proving "it is clear that the behavior

───────────────

[20] The Department of Justice has informed the States that compliance with the ADA requires not only that they offer services to avoid institutionalization, but that they must "ensure that those services are actually available and that individuals can actually secure them to avoid institutionalization." (Emphasis added.) ECF139-2@4. The affidavits of Chip and his sister demonstrate that Chip cannot depend on the availability of respite services. ECF175-4 and 5. Their statements that it has taken months to locate respite caregivers willing to work for the low wages paid for respite services are not contradicted, or even addressed by Defendants. Further, as discussed above, the unavailability of respite services are supported by the audit of the LAC. Lennie Mullis, who provides DDSN services across the State, testified in her affidavit in the lack of availability of respite services as did Carolyn Myers, mother of Al Myers. ECF175-8 and 12. The official responsible for the administration of the MR/RD waiver program acknowledged that DDSN pays providers $16 an hour for personal care attendant services, but only $10.50 an hour for respite services. ECF207-19@35. (The caregiver receives even less, after administration expenses are deducted by the business providing the service.)

is unlikely to recur." Id., citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n. 10, (1982). As in *Pashby,* it is possible, and indeed likely, that the Defendants will once again reduce Chip's in-home personal care attendant services. *Pashby* at 316.  Not only have Defendants still not provided the services Chip's physician has determined to be medically necessary, but the documents, affidavits and orders in the record show that it is very likely that the Defendants' behavior of reducing Chip's services will reoccur. ECF166-14, 175-9 and 10. It is even more likely in Chip's case that the wrongful behavior will reoccur, not only because of the long history of these agencies' resistance to following court orders, but because, in South Carolina, agency officials at DDSN and DHHS have reduced and terminated critical services needed by the most disabled citizens to remain at home with impunity, without notice to or approval by the General Assembly.[21]

---

[21]    In *Pashby*, the General Assembly had approved the waiver reductions and it is likely that legislators in North Carolina will pay more attention to and comply with this Court's orders. 709 F.3d 307 (4th Cir. 2013). In the case of *Stogsdill v. DHHS,* the South Carolina Court of Appeals held that the 2010 changes violated the ADA and that DHHS failed to meet its fundamental alteration burden under the ADA, but that court ruled that DHHS was not required to promulgate regulations to enforce binding norms. *Stogsdill v. DHHS*, Opinion No. 5271 (S.C.Ct.App. 2014). This left the plaintiff with a hollow victory, as DHHS will likely evaluate his need for services using the same arbitrary criteria applied in *Al Myers v. DHHS, supra.* However, the South Carolina Supreme Court granted cert. and agreed to consider whether DHHS has violated the South Carolina Administrative Procedures Act by imposing reductions and terminating services without promulgating regulations. Case No. 2014-002013 (S.C. Supreme Court 2014). As will be discussed below, the obligation to establish reasonable standards for the

38

It is undisputed that Defendants intend to reassess Chip, as the affidavits of the directors of DDSN and DHHS show and Defendants have confirmed that they have no intention to promulgate regulations to establish standards for the administration of the waiver program.[22]

The district court also erred as a matter of law in determining that Chip's ADA and Section 504 claims were mooted by action taken by Defendants in his administrative appeal. As in *Doe v. Kidd I,* state administrative proceedings should not be considered because this Court has held that the outcome of those proceedings "has no effect, preclusive or otherwise, on the issues" presented here. 501 F.3d fn 1. As this Court held in *Doe I,* this argument "misses the point," because "there is no identity of issues..." in the administrative proceedings and

---

administration of Medicaid waiver programs is a federal mandate that supercedes any decision of state agencies or the South Carolina Court of Appeals.

[22] These officials and those who testified at the fair hearing of Al Myers, have acknowledged that they have no intention of promulgating regulations to establish reasonable standards for the administration of the DDSN waiver programs, so it is likely that the unreasonable standards applied in the case of Al Myers will be applied to Chip. ECF207-19 and 20, 169-3.The testimony of Janet Priest and Kara Lewis also demonstrate that the Defendants have no intention of giving any deference to the treatment decisions of Chip's physician, as required by *Olmstead v. L.C., supra.* The officials who are in charge of administration of the MR/RD Medicaid waiver program at DDSN and DHHS testified, two years after Chip filed this lawsuit, that they have not even considered whether DHHS and DDSN violated the ADA in establishing the reductions and terminations in services in 2010. Id.

39

Chip's federal claims. Id. at fn3. The "final administrative decision" issued by the hearing officer in this case simply determined that there had been no reduction in Chip's services. The hearing officer did not address Chip's claims brought in this lawsuit, specifically the hearing officer did not consider or rule upon his claims that Defendants violated the ADA. Because Chip has raised other issues in his federal lawsuit that were never considered nor ruled upon in the administrative proceeding, his claims in this lawsuit are not moot.

Chip has met his *prima facie* burden to prove violation of the ADA (ECF73) and Defendants have failed to meet their burden of proving that it would cause a fundamental alteration of the State's system to provide the services Chip's physician has ordered. Not only did the district court find that the cost of providing Chip care at home would be less than providing care in an institution, the South Carolina Court of Appeals agreed in 2014 that it would not cause a fundamental alteration in the States's system to provide services necessary for waiver participants to live at home. ECF73, *Stogsdill, supra.* Adopting this Court's ruling in *Pashby,* the South Carolina Court of Appeals joined other federal circuits in ruling that "financial constraints alone cannot sustain a fundamental alteration defense."[23] Opinion No. 5271 (S.C.Ct.Ap. September 10, 2014), citing *Pashby.*

---

[23] In any event, Defendants' own records document that the cost of the waiver program actually increased by more than $50 million when home-based

40

709 F.3d at 323-24.  Chip prays that this Court will reverse the decision of the district court by finding that his ADA and Rehabilitation Act claims are not moot and will find that Chip is the prevailing party entitled to summary judgment on this issue.

**Issue 2.**    **Have the Defendants violated Chip's rights to receive, with reasonable promptness,  services in the amount, duration and scope ordered by his treating physician and failed to establish and apply reasonable standards, and to provide services comparable to those provided in institutional settings in violation of the Medicaid Act and 42 U.S.C. 1983?**

The district court erred in its findings that Chip has raised "new issues and arguments"  for violation of the Medicaid Act. Chip alleged in his Amended Complaint that Defendants violated the Medicaid Act by failing to provide services with reasonable promptness (42 U.S.C. 1396a(a)(8)), failing to provide services to individuals with severe disabilities comparable to those in institutions (42 U.S.C. 1396a(a)10)), failing to provide services in the amount, duration and scope necessary (42 U.S.C. 1396a(a)(10)), and failing to establish and employ reasonable standards (42 U.S.C. 1396a(a)(17)). The district court erred in granting Defendants summary judgment on those claims for enforcement of the Medicaid Act under §

---

services were reduced in 2010 and the average annual cost per participant increased from approximately $37,000 a year per participant to more than $44,000 per participant. ECF12-10 and 11.

1983 because they were not first raised in his motion for summary judgment and

they are not moot.

This Court has already determined that claims for violation of the reasonable

promptness mandate of the Medicaid Act meet the *Blessing* test and can be

privately enforced under § 1983. *Doe v. Kidd I* at 357, citing *Blessing v. Freestone,*

520 U.S. 329 (1997).[24] Medicaid participants are clearly the intended beneficiaries

of the requirement that States provide services in the amount, duration and scope

necessary to meet the goal of the Medicaid waiver program, i.e. to remain in their

communities[25] (42 U.S.C. 1396a(a)(10), this case shows that they, not the State, are

---

[24] This Court recognized in *Doe I* that, except where an express provision of the statute demonstrates Congressional intent to prohibit private enforcement, the Supreme Court has found 'private enforcement foreclosed only when the statute itself creates a remedial scheme that is sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.,* citing *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 520-21 (1990). The United States Supreme Court and this Court have both concluded that "[t]he Medicaid Act contains no comparable provision for private judicial or administrative enforcement." In *Doe v. Kidd I*, this Court noted that fifteen years after issuing *Wilder,* the Supreme Court listed the Medicaid Act "as an example of a federal statute for which § 1983 is available, given that the statute does not provide a private judicial remedy for rights that have been violated." 501 F.3d 357.

[25] This Court has a long history of allowing private enforcement of § 1396a(a)(10) by Medicaid beneficiaries. *Fabula v. Buck*, 598 F.2d 869, 873 (4th Cir. 1979). It cited *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3rd Cir.2004) in *Doe v. Kidd I* "holding that an analysis based upon Gonzaga, Blessing, and other cases "compels the conclusion that the provisions invoked by plaintiffs—42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15)—unambiguously confer rights vindicable under § 1983." 501 F.3d

42

the beneficiaries of the Congressional mandate that States must establish reasonable standards[26] (42 U.S.C. 1396a(a)(17) and this Court has previously recognized in *Pashby* that persons who wish to remain in their homes, are the intended beneficiaries of the comparability requirement of the Medicaid Act (42 U.S.C. 1396(a)(10). 709 F.3d at 325.

This Court has never found that interpreting these provisions of the Medicaid Act are so "vague and amorphous" that it would strain this Court's judicial competence to interpret them. *Doe I* at 356. None of these provisions are optional or precatory and they unquestionably impose mandatory obligations on the States. Id.

Chip complained in ¶ 302 of his Amended Complaint that Defendants have violated the reasonable promptness requirements of the Medicaid Act, which

---

357. In *Antrican v. Odom,* this Court also found that Medicaid participant's rights under 1396a(a)(10) were privately enforceable. 290 F.3d 178 (2002). More recently, in *Bontrager v. Indiana Family & Social Services Administration*, the Seventh Circuit held 42 U.S.C. 1396a(a)(10) to be enforceable under § 1983, holding that "Wilder has not been overruled...[I]t is [the Supreme Court's] prerogative alone to overrule one of its precedents." 697 F.3d 604, 607 (7th Cir. 2012).

[26] This Court declined to rule upon whether the reasonable standards mandate is enforceable under § 1983 in *Pashby*, but this decision was based on Defendants' arguments of those claims being brought under the Supremacy Clause, not the Civil Rights Act, as Chip has done in this case. 709 F.3d 325.

require DHHS to provide an evidentiary hearing and to render a final

administrative decision within 90 days and to actually <u>provide</u> the services with

reasonable promptness.[27] In *Doe v. Kidd I,* this Court held that "the provision is

clear that the standard for informing applicants of their eligibility for Medicaid

services is 'reasonable promptness' and the relevant federal and state regulations

and manuals define reasonable promptness as forty-five days or ninety days,

depending on the applicant." 501 F.3d 356, citing 42 C.F.R. § 435.911; the South

Carolina Medicaid Manual, and United States Department of Health & Human

Services Center for Medicaid and State Operations, Olmstead Update No: 4.

   DDSN and DHHS are repeat offenders. This Court found these same

Defendants to be in violation of the reasonable promptness mandate in *Doe v.*

*Kidd II,* Case No. 10-1191(4th Cir. 2011). As in that case, years have passed since

Chip's physician ordered services which have still not been provided to him. In

reversing the district court's grant of summary judgment to DDSN and DHHS and

granting summary judgment to the MR/RD waiver participant in *Doe II,* this Court

found that "Defendants admit that they abdicated their responsibility to furnish

---

   [27] In *Doe v. Bush,* the Eleventh Circuit held that "there is no ambiguity" that
the request from an individual for services "starts the 90-day time period in which
the defendants are to evaluate the individual and provide or deny services."  261
F3d 1037, 1061 (2001).

44

Doe with the necessary services in the least restrictive environment," where nine years after the plaintiff requested a fair hearing on her request for residential habilitation services,[28] those services had not been provided and her state court appeal had been pending for six years. Id. at 18.

But, the testimony of DDSN official Janet Priest and DHHS official Kara Lewis, who were responsible for the administration of the MR/RD Medicaid waiver program in South Carolina, demonstrates that the agencies have paid no attention to the holdings of this Court or their obligations to comply with the reasonable promptness mandate of the Medicaid Act. ECF207-10 and 11. Defendants have failed to give Chip a hearing on his fair hearing appeal or to provide the services Chip needs with reasonable promptness and he is entitled to summary judgment on this issue.

Chip alleged in ¶¶3, 200 and 292 of his Amended Complaint that Defendants have failed to provide the services he needs in the amount, duration and scope necessary. Defendants have testified that doctors' orders are not entitled to any deference in allocating services and that the authority for awarding hours

---

[28]  Doe's 2002 request for a fair hearing was dismissed in 2003 without providing the evidentiary hearing she requested. *Doe v. Kidd I,* 501 at 352. Her 2005 fair hearing was not resolved until 2014, nearly three years after the South Carolina Supreme Court reversed the decision of the hearing officer and remanded her appeal back to the agency to provide a fair hearing. *Doe v. Kidd III, supra.*

lies solely with the DDSN service coordinator, who is prohibited from awarding any more hours than allowed by policies of DDSN that have not been promulgated as regulations and do not consider medical necessity. As in *Moore v. Cook,* instead of giving weight to the opinion of Chip's treating physician (as required by *Olmstead)*, Defendants have based treatment decisions on "bureaucratic gobbledegook" having no relation to Chip's actual condition or his needs. Case No. 1:07-cv-631 (N.D.Ga. April 19, 2012). Chip has demonstrated that Defendants have made treatment decisions that shift the burden of his care to his aging father, who is unable to lift him. This is prohibited by the amount, duration and scope provision of the Medicaid Act and the district court erred in granting Defendants' motion on this claim. *Moore v. Cook, supra.*

Chip also alleged that Defendants' failure to establish and apply reasonable standards violated 42 U.S.C. 1396a(a)(17). AC ¶¶3, 7, 292, 294 and 315. This Court held in *Doe v. Kidd I* that an individual's entitlement to services must be "based on *appropriate assessment criteria* that the State develops and applies fairly to all waiver enrollees." (Emphasis added.) 501 at 359.

To be "reasonable," criteria must satisfy both federal and state law. The assessment criteria used by Defendants has not been "appropriate" or "reasonable," because it has failed to give appropriate deference to the opinion of the waiver

46

participant's treating physician, as required by the United States Supreme Court in *Olmstead.* Defendants have acknowledged that they have authorized service coordinators, who have no medical training, to determine the need for services. In doing so, DHHS has violated the regulation promulgated by the General Assembly at S.C. Reg. 126-425(A)(9), which defines "Medically reasonable and necessary" as "procedures, treatments, medications or supplies ordered by a physician, dentist, chiropractor, mental health care provider, or other approved, licensed health care practitioner to identify or treat an illness or injury." Instead, DHHS allows DDSN to deny services ordered by physicians based on "assessments" performed by persons who have no medical training. ECF207-19 and 20. The state medical necessity regulation requires that these procedures, treatments, medications or supplies "must be administered in accordance with recognized and acceptable medical and/or surgical discipline at the time the patient receives the service and in the least costly setting required by the patients' condition." Id. Reg. 126-425(A)(9) requires that "All services administered must be in compliance with the patient's diagnosis, standards of care..." Id. Chip has provided testimony from the hearing of Al Myers and affidavits to show that Defendants have failed to establish standards that are in compliance with waiver participant's diagnosis and reasonable standards of care.

Undisputed evidence in the record demonstrates that Defendants have failed to establish reasonable standards to allocate services in the MR/RD Medicaid waiver program. The order granting summary judgment on this issue should be reversed and Chip prays for an order granting summary judgment to him on this issue.

Chip also alleged in his Amended Complaint that Defendants violated the comparability mandate of the Medicaid Act. AC §§ 3, 292. This Court recently held in *Pashby* that North Carolina violated this comparability requirement "by treating individuals differently even though they have the same level of need." 709 F.3d 307 (4th 2013). The waiver amendments implemented in 2010 established caps on services that previously did not exist. Prior to 2010, some waiver participants' services even cost significantly more than it would cost to provide services to them in an ICF/MR. ECF 2006 DHHS Audit. In order to receive the care Chip's treating physician has determined that he needs, he would have to receive those services in a congregate setting. As Judge Hendricks stated, and Judge Childs agreed:

> His experience in an institution would come with all of the adjunct humiliations that violation of personal space and person imposes. "Institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. Where such an experience can be avoided, without significant alteration of

48

the *status quo*, the United States Supreme Court has stated, it should be.

*Peter B. v. Sanford, supra (Report and Recommendation*). Undisputed evidence shows that Chip is not receiving services at home that are comparable to those provided in institutional settings and the district court erred in granting summary judgment to Defendants on the comparability issue. Chip prays that this Court will reverse the district court and award summary judgment on this issue to him.

**Issue 3.**     **Have Defendants violated Chip's Fourteenth Amendment due process rights and the notice and hearing requirements of the Medicaid Act by failing to provide reasons for the reduction, denial or termination of services in written notices, by failing to include in those notices the regulation or statute DHHS relies upon, by failing to issue final administrative orders that are appealable to the Judicial Branch within 90 days of receiving a request for a fair hearing, and may these laws be enforced under 42 U.S.C. 1983?**

42 U.S.C. 1396a(a)(3) requires state plans "to provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." This Court held in *Doe v. Kidd I* that the fair hearing process is not incompatible with § 1983 enforcement. 501 F.3d 356-357.

The district court's finding that Chip's claims for violation of the due process requirements in the Medicaid Act were not raised in his amended complaint is clearly erroneous. Chip's complaint included allegations of

49

Defendants' violations of his right to life, liberty and property in violation of the Fourteenth Amendment. AC ¶ ¶ 307 and 308. He alleged in Count Three that Defendants have violated his due process rights (42 U.S.C. 1396a(a)(3) by failing to provide legitimate reasons for attempting to reduce services. AC  ¶ ¶ 290 and 294. Chip also alleged that Defendants have failed to cite in their notices the specific regulations supporting adverse actions when MR/RD Medicaid waiver services are reduced (as required by 42 C.F.R. 431.210). Chip complained in ¶ 302 of his amended complaint that Defendants have been in violation of the reasonable promptness mandate requiring DHHS to provide an evidentiary hearing and to render a final administrative decision within 90 days.

It is undisputed in this case that Defendants failed to provide a notice meeting the simple and unambiguous requirements of 42 C.F.R. 431.210. It is also undisputed that Chip was never provided with an evidentiary hearing or a final administrative decision within 90 days of his request for one.

There is no evidence in the record to contradict Chip's claims that the notices provided by Defendants did not contain the reasons for the intended action, and agency witnesses admitted at Al Myers' hearing that the notices did not comply with federal requirements.  42 C.F.R. 431.211 requires notices of reductions in services to be provided at least ten days before the proposed action.

The notice sent to Chip was dated the same day his personal care services were to be reduced. ECF (December 30, 3009 notice). The notice is facially defective. It is also uncontested that those notices of the adverse actions which went into effect on January 1, 2010 did not advise waiver participants of the statute or regulation DHHS was relying upon to cap personal care attendant and other services and to eliminate speech and language services, physical therapy and occupational therapy services.

The requirement to provide an evidentiary hearing is mandatory, not optional, and it is undisputed that such a hearing was never provided. Federal regulations at 42 C.F.R. 431.244(a) state that the agency's decision must be based exclusively upon evidence introduced at a hearing. It is impossible for DHHS to comply with this regulation without providing an evidentiary hearing. Chip was denied his fundamental due process rights granted by the Fourteenth Amendment, which are specifically incorporated into federal fair hearing regulations, along with reference to *Goldberg v. Kelly* in 42 C.F.R. 431.205.  He was denied the right to present witnesses, to cross examine the State's witnesses and to present evidence at a hearing, as specifically required by 42 C.F.R. 431.242 and 431.244(a).

As this Court recognized in *Doe I*, Congress intended that this occur with reasonable promptness and that administrative appeals not be allowed to  delay a

waiver participant's receipt of services. *Doe II, supra*. Federal regulations at 42 C.F.R. 431.244(f) require a final administrative decision to be issued within 90 days. It is undisputed that no final administrative decision was issued within 90 days.

The applicable regulations specifically prohibit a State Medicaid Agency from dismissing a request for a fair hearing except when the participant requests dismissal in writing or fails to appear at a scheduled hearing. 42 C.F.R. 431.223.  It is undisputed DHHS dismissed Chip's appeal without his request or consent.

Defendants have admitted that they did not provide Chip with the reasons for the adverse actions, nor did they provide notices advising him of the statute or regulation Defendants relied upon.   These violations of due process are subject to repetition, yet they have evaded review. The lower court erred in granting Defendants summary judgment on this issue and Chip prays for an award of summary judgment on his due process claims.

## VIII.                      Conclusion.

For the reasons set forth above, Chip prays that this Court will reverse the decision of the lower court, will rule that he is entitled to summary judgment and that he is the prevailing party entitled to legal fees and costs under 42 U.S.C. § 1988 and the ADA. Chip prays for an interlocutory order requiring DHHS to

52

immediately provide the services his treating physicians determine to be medically
necessary until this case is resolved, to be determined based on reasonable medical
standards and taking into account his need for around the clock care.  Because he
has already prevailed on some issues, as been recognized by the Defendants, Chip
prays that this Court will order the district court to issue an order, with reasonable
promptness and applying reasonable standards, awarding legal fees to his
attorneys.

Respectfully submitted,

s/Patricia Logan Harrison
Patricia Logan Harrison            Kenneth Anthony
611 Holly Street                   Anthony Law Firm
Columbia, South Carolina 29205     PO Box 3565
803 256 2017                       Spartanburg, South Carolina
plh.cola@att.net                   864 582 2355
Fed. I.D. No. 6963                 kanthony@anthonylaw.com
                                   Fed. I.D. No. 1132

Counsel for Appellant              Counsel for Appellant

June 8, 2015